**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Paul Joseph Martinage

    v.                              Case No. 16-cv-245-PB

Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration


**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Paul Martinage moves to reverse the Acting Commissioner's decision to deny his applications for Social Security disability insurance benefits, ("DIB"), under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, ("SSI"), under Title XVI, 42 U.S.C. § 1382.  The Acting Commissioner, in turn, moves for an order affirming her decision.  For the reasons that follow, this matter should be remanded to the Acting Commissioner for further proceedings consistent with this report and recommendation.


**I.  Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB

decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §

405(g) as the standard of review for SSI decisions).  However,

the court "must uphold a denial of social security . . .

benefits unless 'the [acting Commissioner] has committed a legal

or factual error in evaluating a particular claim.'"  Manso-

Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per

curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

    As for the statutory requirement that the acting

Commissioner's findings of fact be supported by substantial

evidence, "[t]he substantial evidence test applies not only to

findings of basic evidentiary facts, but also to inferences and

conclusions drawn from such facts."  Alexandrou v. Sullivan, 764

F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,

360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial

evidence is 'more than [a] mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d

594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [acting Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).


## II.  Background

The parties have submitted a Joint Statement of Material Facts.  That statement, document no. 16, is part of the court's record and will be summarized here, rather than repeated in full.

At the time of the decision from which he appeals, Martinage was 25 years old.  He has had some short-term and part-time employment, but he has never engaged in substantial

gainful work activity.

When he was about nine years old, Martinage was diagnosed with juvenile diabetes.  His treatment has included medication and counseling, but he has a long history of noncompliance with directives to monitor his blood sugar, take his diabetes medication, and eat properly.  Because of his diabetes and/or his failure to engage in self care, Martinage has been admitted to: (1) St. Joseph's Hospital, in October of 2007, for diabetic ketoacidosis;[1] (2) Children's Hospital, in January 2008, for ketoacidosis; (3) Parkland Medical Center ("PMC"), in February 2010, for uncontrolled diabetes and chest pain; (4) Southern New Hampshire Medical Center ("SNHMC"), in May 2010, for ketoacidosis; (5) PMC, in January 2011, for uncontrolled diabetes;[2] (6) SNHMC, in April 2013, for ketoacidosis; and (7) SNHMC, in November 2013, for ketoacidosis.  The record also documents several other hospital visits for ketoacidosis that did not result in admissions and one or more occasions on which a medical professional told Martinage to go to the hospital, but

_____

[1] Diabetic ketoacidosis is a "buildup of ketones in blood due to breakdown of stored fats for energy; a complication of diabetes mellitus."  Stedman's Medical Dictionary 1027 (28th ed. 2006).  Stedman's further explains that "[u]ntreated, [diabetic ketoacidosis] can lead to coma and death."  Id.

[2] Rather than being properly discharged, Martinage left the hospital against medical advice.  See Administrative Transcript 1177.

he refused to do so.  <u>See</u> Tr. 1147.

Martinage has also been diagnosed with major depressive disorder, attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder, adjustment disorder, bipolar disorder, borderline personality disorder, anxiety disorder, obsessive-compulsive disorder, marijuana dependence, and alcohol dependence.  His mental impairments have been treated with both medication and counseling.  Those impairments have also resulted in admissions to: (1) New Hampshire Hospital, in April 2006, for suicidal ideation, self-abusive behavior, and aggression; and (2) SNHMC, in May 2013, for severe depression and suicidal ideation.  Beyond his hospitalizations, Martinage has a history of treatment at the Greater Nashua Mental Health Center ("GNMHC"), going back at least as far as 2006.  His treatment has included both medication and counseling.

In April 2006, GNHMC initiated Martinage's involuntary admission to New Hampshire Hospital.  In November 2008, after an apparent hiatus in treatment, Martinage was seen by Dr. Lancaster and Dr. Christopher Benton at GNHMC for an intake evaluation.  He was discharged in June 2009 when he moved out of the area.

In August of 2009, Martinage returned to GNHMC and received a reopening evaluation that was documented on a form signed by Linda Stakun, a licensed mental health counselor, and Dr.

5

Benton.  In February 2010, Dr. Benton performed a psychiatric

evaluation in which he reported the following history:

> [Martinage] states he has low energy, low motivation,
> difficulty organizing tasks, [and] tends to lose
> things. . . . Poor memory.  Difficulty as an adult
> keeping track of things and reported difficulty
> processing.  He requires a great deal of structure to
> be effective.  He has lost numerous jobs.  If the
> shift changed to different times he has difficulty
> adjusting and adapting to the requirements. . . .  He
> seems to get lost.  He has difficulty with directions.
> Also has episodes where he gets "pretty pissed, pretty
> quickly" and irritable toward others.

Administrative Transcript (hereinafter "Tr.") 1615.  Based upon

a mental status exam, Dr. Benton reported that Martinage had

"[d]ifficulty in maintaining attention."  Tr. 1616.  Under the

heading "Summary & Assessment," Dr. Benton wrote: "20-year-old

gentleman who has had multiple jobs and inability to work

independently and to organize events in his life without a great

deal of structure."  Tr. 1617.  Dr. Benton saw Martinage in

March, April, and June of 2010.  In October of 2010, Martinage

was discharged from GNHMC for losing contact with the agency.

He returned to GNHMC in September of 2012, when an intake

evaluation was performed by Stakun.  In October of 2012, nurse

Carol Drouin performed a psychiatric evaluation in which she

reported that, among other things, Martinage was seeing Stakun

every two weeks.  She also reported the following social

history: "He is frequently terminated from jobs for his attitude

or conflict with either co-workers or his boss."  Tr. 1612.  In

April of 2013, Martinage was discharged after he lost contact with GNMHC.

In May of 2013, Martinage reinitiated treatment at GNHMC, and Drouin completed another psychiatric evaluation. She noted that Martinage was suicidal, and referred him to SNHMC. He was admitted to SNHMC that same day, "for safety stabilization and treatment," Tr. 1365, and remained hospitalized for two days. In a Psychiatric Discharge Summary, Dr. Christopher Duros noted that Martinage "has difficulty keeping jobs due to problems with authority [and] getting into interpersonal conflicts with his supervisors and co-workers." Tr. 1366. After his discharge, Martinage saw nurse Drouin twice more during the month of May.

In July of 2013, "[n]urse Drouin and Dr. Benton of the [GNHMC] completed a Mental Impairment Questionnaire [on Martinage]." Jt. Statement, doc. no. 16 at 28. In it, they identified the following diagnoses: bipolar disorder, anxiety disorder, ADHD, borderline personality disorder, and cannabis dependence. In response to a question about the relationship between Martinage's psychiatric condition(s) and his physical symptoms, they wrote:

> Depression sometimes makes self care difficult, i.e., stays in bed, not getting dressed and not taking medications as prescribed. Diabetes not well controlled.

Tr. 1463. In the section of the form devoted to functional

limitations, they indicated that claimant: (1) was limited most of the time on a sustained basis in three areas (tolerating stresses common to a work setting, interacting appropriately with the general public without exhibiting behavioral extremes, and adapting or responding appropriately to changes in a work setting); (2) was limited more than a third of the time in eight areas;[3] and (3) was limited but still functioned satisfactorily in three areas. They identified no area in which he had only mild limitations or had no limitations at all. As a basis for the limitations they found, Drouin and Dr. Benton indicated that Martinage exhibited 22 different signs and symptoms.

They further opined that Martinage would decompensate four or more times during a 12-month period for at least two weeks at a time. They described his decompensation this way:

> Multiple episodes including hospitalization in May 2013 for suicidal ideation with thoughts of overdosing on insulin or medications. Reports increase in anger over last month.

Tr. 1466. They also indicated that as a result of Martinage's impairments or treatment for them, he would be absent from work

---

[3] Those eight areas are: (1) completing activities of daily living; (2) maintaining social functioning and communicating appropriately with others; (3) concentration; (4) task completion; (5) maintaining attendance and a schedule; (6) accepting instructions and responding appropriately to criticism from others; (7) working in coordination with or proximity to others without being unduly distracted; and (8) completing a normal work day and workweek without interruptions from psychologically based symptoms.

more than four days per month.  Finally, when asked to describe

any additional reasons why Martinage would have difficulty

maintaining a full time job, Drouin and Dr. Benton wrote: "Mood

instability, difficulty maintaining personal safety, controlling

anger, unstable relationships, [and] poor coping skills."  Id.

Martinage saw Drouin again in September 2013.  She

reported:

> He has distance[d] himself from his father and
> step-mother who are his sources of emotional support.
> He is sleeping about 10-12 hours.  He is describing
> anhedonia.  His energy level is low.  His
> concentration is fair.  His appetite is diminished.
> He has suicidal ideations with thoughts of hanging
> himself [or] overdosing on insulin.  He believes there
> is a 30-40% chance that he would act on these
> thoughts.

Tr. 1630.  Case management progress notes from GNMHC indicate

that in August 2013 Martinage lost a job due to absences and

that in July 2014, he quit a job after having a dispute with a

coworker.  Similarly, a recovery plan drafted by several

providers at GNHMC states that Martinage "struggles to maintain

employment and often gets into arguments with his boss/co-

workers."  Tr. 1738.

In January 2014, the Social Security Administration ("SSA")

referred Martinage to Dr. Joan Scanlon for a consultative

psychological examination.  With respect to Martinage's current

level of functioning, Dr. Scanlon gave the following opinions:

A.  Activities of Daily Living: . . . Mr. Martinage executes essential activities of daily living, such as executing household chores, attention to grooming and hygiene, and does not present as limited in this area.

B.  Social Functioning: . . . [T]he claimant has established a very positive relationship with his stepmother despite their early history, maintain[s] relations with a variety of friends, and spoke of very positive relationships in the workplace.  Although his suicidal attempts have been precipitated by loss of relationships, per his report as well as medical records, he does not present as limited in this area.

C.  Understanding and Remembering Instructions: . . . Mr. Martinage is able to understand and remember locations and work-like procedures as exemplified in his prior places of employment; his ability to recount the steps of managing his diabetes speaks to his understanding of detailed instructions.  He is not limited in this area.

D.  Concentration and Task Completion: . . . [T]he claimant is able to execute simple, overlearned routines, and persisten[ce] and pace [were] not noted as a difficulty in his places of work.  However, he did evidence consistent struggles with information processing and tasks of greater complexity in this examination.  He presents as somewhat limited in this area.

E.  Reaction to Stress, Adaptation to Work or Work-Like Situations: . . . [T]he claimant was generally able to sustain stresses in the work setting, reporting only one negative event.  He is further able to render simple decisions, maintain attendance and a schedule by his report, and positive relationships with work personnel, as described.  He is not limited in this area.

Tr. 1691-92.

The Disability Determination Explanation ("DDE") forms generated by claimant's applications for DIB and SSI include a Psychiatric Review Technique ("PRT") assessment of Martinage

performed by Dr. Patricia Salt, a non-examining state-agency psychiatric consultant.  She noted the following relevant diagnoses: diabetes mellitus, affective disorders, substance addiction disorders, anxiety disorders, and personality disorders.  For the purposes of determining whether any of claimant's mental impairments satisfied the so-called "paragraph B" criteria of a listed impairment, Dr. Salt reported that claimant had mild restrictions on his ability to perform the activities of daily living; mild difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and had no episodes of decompensation, each of extended duration.

Dr. Salt also performed an assessment of Martinage's mental residual functional capacity ("RFC").[4]  She opined that Martinage had no limitations in the areas of understanding and memory, social interaction, and adaptation.  With respect to claimant's capacity for sustained concentration and persistence, Dr. Salt opined that Martinage had no significant limitation in six of eight abilities, and moderate limitations in two others: the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods.

------

[4] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1).

Martinage received a hearing on his claim before an Administrative Law Judge ("ALJ").  At the hearing, Martinage's counsel asked him about managing his diabetes:

> Q    Have you had trouble managing your diabetes?
>
> A    From day one.
>
> Q    Can you tell the Judge what your problems have been managing your diabetes?
>
> A    Taking my insulin, monitoring my blood sugar levels, bringing insulin with me if I leave, bringing a snack with me if I leave.  Pretty much everything diabetes related.
>
> . . . .
>
> Q    Can you explain why you have trouble doing these things?
>
> A    Because I [am] depressed, I don't care to do them.  It's a struggle to take out my blood sugar, to do my finger stick, to wait, to count carbs I need to draw out my insulin.  I don't care.  I'm too depressed to – I know what the long-term effects are and I just don't care.
>
> Q    So when you don't take care of yourself with the diabetes, what happens to you physically?
>
> A    I get violently sick, I can't leave the bathroom, vomiting constantly.
>
> Q    And you end up having to go to the hospital?
>
> A    Yes.
>
> Q    So knowing that that happens to you that you end up in the bathroom vomiting, having to go to the hospital, you still have trouble taking your insulin and counting your carbs?
>
> A    Yes.

Q    Have you[r] parents tried to help you with managing your diabetes?

A    At first, when I was first diagnosed, yes. As I grew up and got older, they kind of left me to my own devises to take care of myself. I don't have the willpower to do it.

Tr. 92-93. Claimant's counsel questioned his mother on the same topic:

Q    Now Paul has had diabetes since approximately the age of 9. Has he had trouble managing the diabetes?

A    Ever since he was younger. It was with our guidance when he was younger.

Q    And since he's become an adult, have those problems with managing the diabetes contin[ued]?

A    Yes, they're worse.

Q    They're worse? Can you explain what you observe his problems to be managing his diabetes?

A    Because he's depressed, because he doesn't care. When he's in that mood, he doesn't do his readings.

Q    His blood sugar readings?

A    He has admitted that he doesn't do them yearly [sic] and he should be doing them three or four times a day. He has been dropped by many different doctors because he does not follow protocol. They've kind of given up on him, so that's why he has so many different doctors that have tried to work with him. His A1c has been 12 of 13 since a very young age.

Q    Which is very high.

A    Which is very high. We've told him he won't have a long life and he is well aware of that. He cannot move beyond the way he is.

Tr. 96-97.

After the hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

4. The claimant has the following severe impairments: diabetes mellitus, attention deficit hyperactivity disorder, Bipolar II disorder, depression, anxiety, borderline personality traits and substance abuse (20 CFR 404.1520(c) and 416.920(c)).

. . . .

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . . .

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant needs to avoid exposure to heights and dangerous machinery. He is able to understand, remember and carry out routine tasks and short simple instructions. He is able to maintain attention and concentration for extended periods. He is able to perform activities within a schedule and maintain regular attendance. He is able to complete a normal 8-hour workday and 40-hour workweek without interruption for psychologically based symptoms. He can perform at a consistent pace. He is able to sustain an ordinary routine without supervision. He is able to as[k] simple questions and request assistance. He is able to accept instructions and respond appropriately to criticism from supervisors. He is able to respond appropriately to changes in the work setting.

. . . .

11. Considering the claimant's age, education, work

experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform (20 CFR
404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 23, 26, 27-28, 30. The ALJ based his decision upon a

determination that claimant's "limitations have little or no

effect on the occupational base of unskilled work at all

exertional levels." Tr. 30.


## III. Discussion

### A. The Legal Framework

To be eligible for disability insurance benefits, a person

must: (1) be insured for such benefits; (2) not have reached

retirement age; (3) have filed an application; and (4) be under

a disability. 42 U.S.C. §§ 423(a)(1)(A)-(D). To be eligible

for supplemental security income, a person must be aged, blind,

or disabled, and must meet certain requirements pertaining to

income and assets. 42 U.S.C. § 1382(a). The question in this

case is whether the ALJ correctly determined that Martinage was

not under a disability from December 14, 2010, through May 19,

2015.

To decide whether a claimant is disabled for the purpose of

determining eligibility for either DIB or SSI benefits, an ALJ

is required to employ a five-step process. See 20 C.F.R. §§

404.1520 (DIB) & 416.920 (SSI).

The steps are: 1) if the [claimant] is engaged in
substantial gainful work activity, the application is
denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

[i]n assessing a disability claim, the [Commissioner]
considers objective and subjective factors, including:
(1) objective medical facts; (2) [claimant]'s
subjective claims of pain and disability as supported
by the testimony of the [claimant] or other witness;
and (3) the [claimant]'s educational background, age,
and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

**B.   Martinage's Claims**

Martinage claims that the ALJ erred in determining his RFC

16

by: (1) giving too much weight to the opinions of Drs. Scanlon and Salt; (2) giving too little weight to the July 2013 opinion of Dr. Benton and nurse Drouin; (3) failing to evaluate the opinions of four other treating sources; and (4) inadequately analyzing the combined effects of his diabetes and his mental impairments.  The court agrees that the manner in which the ALJ handled the opinion provided by Drouin and Dr. Benton merits a remand.

1.  Weight Given to the July 2013 Opinion

Generally speaking, when an ALJ evaluates opinions on a claimant's functional capacity submitted by medical sources,

> the greatest weight should be placed on opinions from treating sources, with less weight placed on opinions from medical sources who merely examine a claimant, and the least weight of all on opinions from medical sources who have neither treated nor examined a claimant.

Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *6 (D.N.H. Aug. 27, 2015) (quoting McLaughlin v. Colvin, No. 14-cv-154-LM, 2015 WL 3549063, at *5 (D.N.H. June 8, 2015)); see also 20 C.F.R. §§ 404.1527(c) & 416.927(c).  Moreover,

> [i]f [an ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).

But even when an ALJ does not give controlling weight to the opinion of a treating source, he or she is obligated to determine the amount of weight to give that opinion by considering: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the medical specialization of the source giving the opinion; and (6) any other factors that may support or contradict the opinion.  See 20 C.F.R. §§ 404.1527(c)(2)-(6) & 416.927(c)(2)-(6).  Indeed, after an ALJ performs the requisite analysis, "[i]n many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  Hunt v. Colvin, No. 16-cv-159-LM, 2016 WL 7048698, at *7 (D.N.H. Dec. 5, 2016) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996)).

Finally, an ALJ is obligated to give good reasons for the weight he or she assigns to the opinion of a treating source.  See 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).

> To meet the "good reasons" requirement, the ALJ's reasons must be both specific, see Kenerson v. Astrue, No. 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011) (citation omitted), and supportable, see Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010).  In sum, the ALJ's reasons must "offer a rationale that could be accepted by a reasonable

mind." <u>Widlund v. Astrue</u>, No. 11-cv-371-JL, 2012 WL
1676990, at *9 (D.N.H. Apr. 16, 2012) (citing <u>Lema v.
Astrue</u>, C.A. No. 09-11858, 2011 WL 1155195, at *4 (D.
Mass. Mar. 21, 2011)), <u>report and recommendation
adopted by</u> 2012 WL 1676984 (D.N.H. May 14, 2012).

<u>Jenness</u>, 2015 WL 9688392, at *6.

In his decision, the ALJ had this to say about the opinion

provided by Drouin and Dr. Benton:

> As for the opinion evidence, the undersigned has
> considered the July 2013 opinion of Nurse Practitioner
> Drouin.  However, this source is not an acceptable
> medical source within the meaning of the Social
> Security Act (20 C.F.R. 404.1513 and 416.913).
> Moreover, her clinic notes do not support the
> limitations alleged.  Nurse Practitioner Drouin did
> not treat the claimant at all between October 2012 and
> May 2013.  When he did return for treatment, he
> admitted to daily use of marijuana and ongoing use of
> alcohol at a level of 8-9 beers at one time.  He also
> admitted that he was dealing with pending legal issues
> yet, despite all of these concerns, he exhibited
> normal speech, good eye contact and intact judgment.
> Therefore, the undersigned affords this opinion little
> weight.

Tr. 29 (citations to the record omitted).

There are several problems with the ALJ's handling of the

opinion at issue.  First, the ALJ characterized it as "the July

2013 opinion of Nurse Practitioner Drouin."  Tr. 29.  But the

opinion was signed by both Drouin <u>and</u> Dr. Benton.[5]  Because Dr.

Benton <u>is</u> an acceptable medical source, <u>see</u> 20 C.F.R. §§

---

[5] While the ALJ missed that point, the Acting Commissioner
at least tacitly acknowledges it; the parties' Joint Statement
says that "Nurse Drouin and Dr. Benton . . . completed a Mental
Impairment Questionnaire," doc. no. 16, at 28.

404.1513(a)(1) & 416.913(a)(1), the ALJ did not give a good reason for discounting that opinion when he treated it as the product of someone who was not an acceptable medical source. In her motion, the Acting Commissioner attempts to evade the consequences of the ALJ's error by arguing that claimant's treatment history with Dr. Benton was limited in scope, but "it is not for the Acting Commissioner to defend the ALJ's decision with rationales that the ALJ did not articulate." Hunt, 2016 WL 7048698, at *9 (citing Letellier v. Comm'r of SSA, No. 13-cv-271-PB, 2014 WL 936437, at *8 (D.N.H. Mar. 11, 2014) (collecting cases); Haggblad v. Astrue, No. 11-cv-028-JL, 2011 WL 6056889, at *13 (D.N.H. Nov. 17, 2011)).

Next, the ALJ justified giving little weight to the opinion because "Drouin did not treat the claimant at all between October 2012 and May 2013." Tr. 29. However, as the Acting Commissioner correctly concedes, Martinage did see Drouin in November of 2012. She attempts to argue around the ALJ's erroneous statement by pointing out that claimant's treatment with Drouin during the period at issue was minimal rather than nonexistent. But, again, such post-facto justification is insufficient. See Hunt, 2016 WL 7048698, at *7.

Finally, the ALJ stated that Drouin's treatment notes did not support the opinion because: (1) a May 14, 2013, mental status examination revealed "[s]peech [of] a normal rate" and

"judgment [that was] grossly intact," Tr. 1450; and (2) a May
30, 2013, mental status exam revealed "[s]peech . . . of normal
rate," "good eye contact," and "judgment [that was] mostly
intact," Tr. 1453.  Instead of focusing on those justifications,
the Acting Commissioner points to other clinical findings and
argues that those findings, unmentioned by the ALJ, undermine
the July 2013 opinion.  Yet again, the Acting Commissioner makes
an argument that goes beyond the ALJ's rationale, which is not a
permissible approach to arguing for the affirmance of an ALJ's
decision.  See Hunt, 2016 WL 7048698, at *7.  As for the
rationale that is properly before the court, i.e., the one the
ALJ articulated in his decision, the court is not persuaded.  In
his decision, the ALJ plucked three observations from one or two
mental status examinations, but he said nothing about how
Drouin's appraisal of Martinage's speech, eye contact, or
judgment undermined any aspect of the opinion that she and Dr.
Benton gave on Martinage's mental RFC.  Thus, the ALJ's
rationale lacks the specificity necessary to count as a good
reason for giving little weight to the July 2013 opinion.

In sum, this case must be remanded so that the Acting
Commissioner may conduct a proper evaluation of the July 2013
opinion, in accordance with 20 C.F.R. §§ 404.1527(c) &
416.927(c).

2.   Other Issues

The ALJ's handling of the July 2013 opinion is enough to warrant a remand.  There is, however, an additional problem with the ALJ's decision that is worth noting at this point, to aid the parties on remand.  Claimant argues that in assessing his RFC, the ALJ failed to adequately consider the relationship between his diabetes and his mental impairments.  The court agrees.

With respect to multiple impairments, the applicable social security regulation provides:

> In determining whether [a claimant's] physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.

20 C.F.R. §§ 404.1523 & 416.923.

Here, in the context of determining whether Martinage had an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, at Step 3 of the sequential evaluation process, the ALJ stated: "As for any mental health issues related to the claimant's episodes of ketoacidosis, these symptoms and signs are considered in combination with the claimant's other mental health diagnoses."

Tr. 26.  But the section of the ALJ's Step 3 analysis devoted to

Martinage's mental impairments does not appear to say anything

about the relationship between those mental impairments and

claimant's episodes of ketoacidosis.  However, at Step 2, the

ALJ did have this to say about the discharge summary that

resulted from Martinage's 2006 admission to New Hampshire

Hospital:

> [H]is diabetes was poorly controlled.  Psychiatrist,
> Dr. Robert Vidaver indicated that the claimant did not
> exhibit any interest in controlling this condition.
> Thus, he diagnosed a personality disorder at that
> time.

Tr. 23.  Later on, in his analysis of the credibility of

claimant's statements about his symptoms, the ALJ described

claimant's hearing testimony: "He has trouble managing his

diabetes.  He does not care to deal with it due to depression.

He knows the long-term effects but he does not care."  Tr. 28.

He also described testimony from claimant's mother: "She has

tried to help him manage his diabetes with reminders, but he

will not follow-through.  He does not have the desire.  He has

episodes of ketoacidosis every other month or so."  Tr. 28.  The

ALJ concluded:

> While the undersigned has also considered testimony by
> the claimant's parents regarding complications of
> diabetes, the medical records clearly show that each
> instance of documented ketoacidosis occurred in the
> context of the claimant's noncompliance with
> treatment.  Yet there is no documented medical reason
> for the claimant's non-compliance as supported by

23

>       evidence that he was dismissed from the diabetes
>       clinic due to his behavior of missing appointments.

Tr. 29.

In her motion, the Acting Commissioner supports the ALJ's conclusion by arguing that "there is evidence in the record suggesting that [Martinage's] non-compliance [with his treatment regimen] was unrelated to his mental problems." Doc. no. 15-1, at 17. She then points to evidence that the ALJ did not cite, i.e., a chart document generated by a May 7, 2012, office visit with physician's assistant ("PA") in an endocrinology practice who noted Martinage's noncompliance and also reported that Martinage denied depressive symptoms during that office visit. However, in that same chart document, the PA reported Martinage's history of depression, and the PA adjusted Martinage's prescriptions for Wellbutrin and Lexapro, both of which are anti-depressants.[6] Given that Martinage's PA actually treated him for depression by adjusting his prescriptions for Wellbutrin and Lexapro, Martinage's denial of depressive symptoms on May 7, 2012, is not substantial evidence that his

---

[6] Wellbutrin is a "trademark for a preparation of bupropion hydrochloride," Dorland's Illustrated Medical Dictionary 2079 (32nd ed. 2012), which is "used as an antidepressant," id. at 261. Lexapro is a "trademark for a preparation of escitalopram oxalate," id. at 1032, which is "used as an antidepressant," id. at 647.

entire nine-year history of noncompliance with his diabetes self treatment regimen was unrelated to his mental impairments.

While the Acting Commissioner attempts to bolster the ALJ's resolution of this issue by pointing to one bit of medical evidence, the ALJ himself pointed to none. To the contrary, before announcing his conclusion that "there is no documented medical reason for the claimant's non-compliance," Tr. 29, the ALJ observed that Dr. Vidaver based a diagnosis of personality disorder on Martinage's lack of interest in controlling his diabetes. In other words, the ALJ himself identified a documented medical reason for Martinage's noncompliance, that reason being the personality disorder that Dr. Vidaver diagnosed.

Beyond that, the record is replete with evidence that Martinage was noncompliant with his diabetes treatment regimen precisely because he suffered from a mental impairment. Claimant testified that he was noncompliant due to depression. See Tr. 92-93. His mother offered similar testimony. See Tr. 96-97.

Many of the providers who have treated Martinage for diabetes and/or ketoacidosis have noted his mental impairments and the treatment he has received for them. In November 2007, after Martinage presented to the Joselin Clinic with "out of control diabetes with recent [diabetic ketoacidosis]," Tr. 1009,

Dr. Lori Laffel observed that Martinage's "history of significant depression . . . may be interfering with his ability to manage his diabetes," id. In a chart document that resulted from an August 2010 office visit that was devoted to diabetes treatment, the provider at an endocrinology practice noted Martinage's history of noncompliance and assessed him as being was unable to check his blood sugar levels and take his insulin regularly due to "ongoing depression/lack of motivation." Tr. 1263. In the discharge note that resulted from a hospitalization for "[d]iabetic ketoacidosis secondary to noncompliance with insulins," Tr. 1357, in May 2013, the physician who discharged Martinage advised him to see his mental health care provider, or establish care with one, within a week or two, see Tr. 1358.

Conversely, Martinage's providers of mental health care have noted the relationship between his mental impairments and his inability to perform diabetic self care activities. For example, in the discharge note that resulted from Martinage's involuntary admission to New Hampshire Hospital in 2006, Dr. Vidaver wrote:

> Of greater significance is the patient's diabetes, which he has had for several years, and is poorly controlled. The patient appears to have no interest in controlling his diabetes, nor does he follow diet or glucose testing as recommended by his physician and the school nurse. There is a quality of defiance towards the illness and, therefore, there is a risk

towards his own long-term survival as the side effects
of diabetes take their toll.

Tr. 582.  Similarly, in the discharge summary that resulted from
Martinage's psychiatric hospitalization in May 2013, Dr. Duros
noted Martinage's "very negligent . . . self care for diabetes
[and] very poor diabetes control" Tr. 1365, and the role that
apathy played in his noncompliance, see Tr. 1366.  He continued:

> [I]t is very clear with this client that with
> improvement in mood, he is likely to be much more
> effective at controlling his own blood sugars, and
> this would result in significant improvement in his
> physical well being, therefore we eventually decided
> to start Zoloft initially at 25 mg daily.  . . .
> Again the benefits of treatment for his emotional
> disturbance and mood disturbance would result likely
> in significant[ly] better self care.

Tr. 1368.[7]

Finally, in an opinion to which the ALJ gave great weight,
see Tr. 29, Dr. Scanlon did not expressly attribute Martinage's
noncompliance to a mental impairment, but she did devote
considerable attention to his noncompliance.  In the history
section of her report, she wrote:

> [H]e is not currently in active medical management of
> his diabetes; services provided by a diabetic nurse
> have been offered "many times" in the past without
> success.  On this note, Mr. Martinage recounted the
> required steps for managing his diabetes in
> considerable detail . . . .  However, he does not
> follow his regimen . . . .  As apparently has been a

---

[7] Zoloft is a "trademark for preparations of sertraline
hydrochloride," Dorland's, supra note 6, at 2092, which is "used
to treat depressive, obsessive-compulsive, and panic disorders,"
id. at 1699.

> longstanding pattern, his parents will "nag" on him
> "all the time["], given he has never managed his
> diabetes independently or adhere[d] to the required
> regimen.

Tr. 1689.  In her discussion of content of thought, Dr. Scanlon

reported that Martinage's "most recent suicidal plan was by

overdose of insulin and provoking diabetic ketoacidosis."  Tr.

1690.  Her prognosis provides, in pertinent part:

> The claimant is recently exhibiting consistency and
> effort to address his psychological difficulties.
> However, the equally pertinent management of his
> diabetes continues to remain quite problematic.  . . .
> With continued intervention and considerably greater
> focus upon diabetic management, his level of
> functioning will continue to improve.

Tr. 1692.  That a psychological consultant would devote so much

attention to Martinage's management of his diabetes tends to

undercut the idea that his noncompliance is unconnected to his

mental impairment.

In light of the foregoing, the court cannot agree that

substantial evidence supports the ALJ's conclusion that there is

no documented medical reason for Martinage's noncompliance with

his doctors' instructions for managing his diabetes.

Accordingly, on remand, the Acting Commissioner will need to

follow the directive of 20 C.F.R. §§ 404.1523 and 416.923 and

consider the combined effect of Martinage's diabetes and his

mental impairments throughout the sequential evaluation process.

# IV. Conclusion

For the reasons given, the Acting Commissioner's motion for an order affirming her decision, document no. 15, should be denied, and Martinage's motion to reverse that decision, document no. 10, should be granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

Any objection to this Report and Recommendation must be filed within 14 days of receipt of this notice. See Fed. R. Civ. P. 72(b)(2). Failure to file an objection within the specified time waives the right to appeal the district court's order. See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

SO ORDERED.

_____
Andrea K. Johnstone
United States Magistrate Judge

April 20, 2017

cc:  Janine Gawryl, Esq.
     T. David Plourde, Esq.